1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JUSTIN ROBSON,

11            Petitioner,              No. 2:12-cv-0384 LKK EFB P

12        vs.

13   MARTIN BITER,

14            Respondent.         FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner without counsel proceeding with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 2006 judgment of conviction for

18   felony murder during a drug-related robbery, entered against him in the Sacramento County

19   Superior Court.  He seeks relief on the grounds that: (1) the trial court's exclusion of evidence

20   violated his right to due process; (2) his trial counsel rendered ineffective assistance; (3) the

21   prosecutor committed prejudicial misconduct by making false and misleading statements; and (4)

22   the trial court violated his right to due process by failing to give certain jury instructions.  Upon

23   careful consideration of the record and the applicable law, the undersigned recommends that

24   petitioner's application for habeas corpus relief be denied.

25   ////

26   ////

1

I. **Background**[1]

Following a joint trial, a single jury convicted codefendants Ira Gordon, Jamaur Denard Wilson, and Justin Wayne Robson of felony murder occurring during a drug-related robbery. Robson, a Caucasian, cooperated with the police and solicited incriminatory custodial statements from his African-American codefendants, who, unlike Robson, were also gang members. He claimed his scary, violent codefendants made him do it. The robbery, according to the prosecution, was not gang related. All three defendants ridicule Robson's lawyer for different reasons. Needless to say, he is part of central casting for this appeal.

Most of the issues on appeal are related to the court's denial of the severance motions and the difficulties that arose throughout the ensuing joint trial as three defendants pursued antagonistic defenses. Despite the formidable challenges presented by the joint trial, we conclude defendants did, in fact, receive a fair trial, and given the overwhelming evidence of guilt, any flaws were harmless beyond a reasonable doubt. We strike their parole revocation fines and in all other respects affirm the judgments for murder with a robbery-murder special circumstance and various enhancements.

FACTS

In August 2004 all three defendants were about 20 years old and unemployed. When they were not involved in criminal enterprises, they filled their days with swimming, playing dice, drinking, smoking marijuana, and popping pills. The women they lived with were the apparent breadwinners. Gordon and Wilson lived with a woman named Takneeca, her infant son, and Gordon's new girlfriend, 17-year-old Amber W. Robson lived with his girlfriend and her children in the same apartment complex. Robson had known Wilson since they were in third grade together and had served time with Gordon in a correctional facility. Gordon and Wilson were very close friends.

The prosecution presented compelling eyewitness testimony about the chronology of events that occurred on the night of August 3. Amber W. testified that after a day of swimming, watching movies, and partying, Wilson, Gordon, and Robson left to go to the liquor store. Many of the young people in the neighborhood congregated in the parking lot of Ernie's liquor store. About 11:00 p.m., 18-year-old Brad Tarbuskovich arrived in his car with his mechanic friend, Will McGuire. He observed three males standing

---

[1] In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

2

by a blue car: one 19- or 20-year-old white male with a "scratchy kind of beard" and crew cut, about five feet ten inches tall, wearing a light blue E-NYCE shirt and jeans (Robson); one five feet eight inch or five feet nine inch black male with a gold "grill," dreadlocks, a San Francisco Giants jersey, and a tattoo on his inner left forearm (Wilson); and a second black male, who appeared to be about 20 years old, five feet eight inches or five feet ten inches in height and 160 to 170 pounds, wearing a green beanie (Gordon). Tarbuskovich went into Ernie's to buy an ice cream and a soda, and when he returned the black male with the gold grill was test-driving his car with McGuire.

According to Tarbuskovich, Alvin Richardson, the eventual victim, drove up to Ernie's around 11:40 or 11:45 p.m.  His girlfriend, Lakisha Grimes, was riding in the passenger seat.  When she went into the store, Tarbuskovich watched one of the black males, later identified as Gordon, approach the passenger-side door and begin talking to Richardson.  He eventually got into the rear passenger seat.  The white male he identified as Robson got into the rear seat behind the driver.  Grimes returned to the car.

Tarbuskovich saw Wilson, who had test-driven his car with McGuire, standing next to the driver's window of Richardson's car, which was halfway open.  He heard Gordon say, "You're going to play me like that?"  He watched all three males striking Richardson.  Robson pistol-whipped Richardson multiple times and then got out of the car.  Grimes ran into the liquor store screaming for someone to call the police.

Meanwhile, Tarbuskovich watched Gordon and Wilson continue to strike Richardson with their fists.  He heard two to three gunshots and then saw all three defendants run away.  He was "[v]ery confident" of his positive identification of Gordon, Wilson, and Robson during photographic lineups.

Lakisha Grimes's testimony corroborated the account provided by Tarbuskovich, with additional flourishes.  She arrived at Ernie's with her boyfriend, Alvin Richardson, and followed him into the store after Wilson approached her car and made unwelcome advances.  When she got back into the car, Gordon got into the back seat and asked Richardson if he would give them a ride; Robson then got into the back seat as well.  He called to Wilson several times and "kept saying he was waiting on his bro."  Grimes refused to give them a ride, which provoked Robson and Gordon, who exited the vehicle.  As Robson got out of the car he stated, "[F]uck this bitch and her shit."  Gordon pulled out a semiautomatic handgun.

Grimes testified that Gordon told Richardson to give him all his money and everything he had in his pockets.  By then, Wilson was at the driver's window, punching Richardson.  Grimes ran into the

3

store to call for help.  As she returned, it looked like Richardson was trying to get his wallet out of his pocket.  She then observed flashes and heard gunshots with each flash.  Gordon remained in the car, and Wilson and Robson were at the driver's window.  Robson was holding a gun, pointed at the ground.  After the shooting stopped, the three ran away. Richardson died in her arms.  She positively identified all three defendants in a photographic lineup shortly thereafter.

Amber W. testified that Wilson and Robson returned to the apartment first, looking "exhausted, kind of tired like they just, I don't know, they just looked like they just did a workout."  Gordon arrived five minutes later, also looking exhausted and out of breath.  He told Amber W. he could not tell her what had happened.  Robson and Wilson went into a back room together, and then Gordon went into a back room with Wilson.

Robson asked Amber W. and her roommate to accompany him to his apartment because "there was hecka helicopters out there and hecka police."  As Amber W. was leaving the apartment, she heard Robson tell his girlfriend, "Hide this, hide this, hide this in the safest spot."  Robson returned to Amber W.'s apartment about 10 to 15 minutes later.  She heard him tell Wilson and Gordon, "I pistol-whipped that nigga first."  When she asked, "So you robbed him," Robson said nothing.

Amber W. saw Gordon, Wilson, and Robson splitting some marijuana, money, and pills on the counter.  Gordon took about $60 from the split.  When she later asked what he had done, Gordon replied that one of them was going to be in the coffin and the other in jail.  He later told Amber W. that he had shot someone.

Amber W. testified that she had received threatening phone calls from Gordon.  Wilson also called and asked her to lie about what she had seen.

Police investigators found a total of eight baggies of marijuana in the victim's car and three spent .380-caliber Winchester shell cases. In Robson's apartment they found a revolver in a blue purse and a semiautomatic handgun wrapped in a towel, both inside a heater unit.  The bullets recovered from the victim's body were fired from the .380-caliber semiautomatic handgun.

A pathologist testified that the victim sustained several blunt force injuries, bruises, and abrasions consistent with being pistol-whipped and being struck by a fist.  He also sustained three gunshot wounds to the body, and all three were consistent with the victim's sitting in the driver's seat of the vehicle and being shot from the back seat on the right passenger side.

////

4

The prosecution also played tapes of conversations Robson had with each of his codefendants, the subject of which will be discussed as relevant to the issues in which they are pivotal. Gordon ran when confronted by the police, dropping marijuana and Ecstasy pills close by. Robson was arrested, handcuffed, and then escaped. Wilson was apprehended a few days later.

In the face of this mountain of evidence against them, all three defenses were seriously anemic. None of the defendants testified, a particularly dicey strategy for Robson, who was relying on a duress defense. But he had distanced himself from his friends as soon as he was arrested, volunteering damning information against them before he was even interrogated. Gordon argued false identity. Wilson argued he was not involved in the robbery, was not seen with a gun, and was simply in the wrong place at the wrong time.

All three attempted to discredit the eyewitness testimony. On cross-examination, Tarbuskovich revealed that he was a regular user of marijuana and suffered an attention deficit disorder as a child. He testified he was not under the influence at the time of the shooting. Defense counsel tried to highlight some small discrepancies in the descriptions offered by Tarbuskovich and Grimes.

Robson, not the prosecution, called Will McGuire to testify. He candidly admitted that his memory of the events was "a blur" because he had consumed a large amount of alcohol and had smoked marijuana. He told the police that he saw a black man wearing a white shirt standing by the driver's door, "slap boxing" through the window. The black man had a gun.

Roger Ringkamp, one of Robson's neighbors, also testified on his behalf. Ringkamp is seriously disabled from burns he sustained to 45 percent of his body. He is blind and deaf on his left side. Although he had run out of his prescription for codeine on the night of the shooting, he had taken morphine around 10:00 p.m. He testified that he saw Robson standing by the pizza parlor near Ernie's liquor store at the time he heard the gunshots. After the shots were fired, Robson ran toward their apartments.

Gordon argued that Grimes referred to the black man in the rear seat as Wilson's brother Jamiere. He pointed out that Amber W. testified Gordon did not leave in a green beanie, and Grimes testified the person who got into the rear passenger seat was wearing a black Kangol-brand hat.

The jury returned guilty verdicts on all counts of murder, robbery, and the robbery-murder special circumstance, and found true all the firearm enhancements. Defendants were sentenced to state prison for life without the possibility of parole, plus additional

5

1          concurrent terms for the enhancements.  All three defendants
2          appeal.

3   Dckt. No. 1 at 44-51.

4          After petitioner's judgment of conviction was affirmed by the California Court of

5   Appeal, he filed a petition for rehearing.  Resp't's Lodg. Doc. 8.  By order dated August 19,

6   2010, the Court of Appeal modified its opinion but denied the petition for rehearing and declined

7   to change the judgment.  Dckt. No. 1 at 94-96.  Petitioner subsequently filed a petition for review

8   in the California Supreme Court, which was summarily denied.  Resp't's Lodg. Docs. 9, 10.

9   **II.     Analysis**

10          **A.  Standards for a Writ of Habeas Corpus**

11          An application for a writ of habeas corpus by a person in custody under a judgment of a

12   state court can be granted only for violations of the Constitution or laws of the United States.  28

13   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

14   application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

15   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

16   2000).

17          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

18   corpus relief:

19              An application for a writ of habeas corpus on behalf of a
20          person in custody pursuant to the judgment of a State court shall
            not be granted with respect to any claim that was adjudicated on
            the merits in State court proceedings unless the adjudication of the
21          claim -

22              (1) resulted in a decision that was contrary to, or involved
23          an unreasonable application of, clearly established Federal law, as
            determined by the Supreme Court of the United States; or

24              (2) resulted in a decision that was based on an unreasonable
25          determination of the facts in light of the evidence presented in the
            State court proceeding.

26   ////

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a

___

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.

8

1  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

2  there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

3         When it is clear, however, that a state court has not reached the merits of a petitioner's

4  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

5  habeas court must review the claim de novo.[3] *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*,

6  462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

7         **B. Petitioner's Claims**

8                **1. Improper Exclusion of Evidence**

9         In petitioner's first ground for relief, he claims that his right to due process and to present

10  a defense were violated by the trial court's exclusion of evidence of the prior criminal

11  convictions, prior violent acts, and gang affiliations of his co-defendants; and evidence of

12  petitioner's "concern" about the dangerousness of his co-defendants.  Dckt. No. 1 at 8, 9, 20-26.

13  Petitioner argues that the erroneous exclusion of this evidence prejudiced his defense of duress.

14  *Id.*

15         The California Court of Appeal denied this claim, reasoning as follows:

16         **D. Admissibility of Prior Bad Acts, Gang Affiliation, Etc.**

17         Robson asserts yet another challenge caused by the joinder – the
   admissibility of evidence to support his duress defense, evidence

18         that would substantially prejudice his codefendants.  The Attorney
   General gives short shrift to the argument, urging us to find that

19         Robson forfeited the issue by failing to obtain an express ruling on
   the record and by later abandoning it.

20

21         Robson filed motions in limine to admit evidence that Gordon and
   Wilson were members of the "MOB street gang"; that Robson and

22         his girlfriend had been intimidated when Gordon and Wilson
   barged into their apartment and made sexual advances toward

23         Robson's girlfriend; that Gordon had threatened Robson over a $5
   gambling debt, which Gordon incurred in a game of dice; and that

24         Gordon had committed another robbery two nights earlier at the

25         [3] The United States Supreme Court has recently granted certiorari in a case apparently to
   consider this issue.  *See Williams v. Cavazos*, 646 F.3d 626, 639-41 (9th Cir. 2011), *cert. granted

26  in part*, ___U.S.___, 132 S. Ct. 1088 (2012).

same liquor store.  Robson concedes the record does not reflect a dispositive ruling.  The court did state on the record that it believed a statement in which Robson characterized his codefendants as "killers" should be excluded because "[i]t would be pretty difficult in my view, in a special circumstance murder case, to give a limiting instruction to the jury that they could only consider it for state of mind or what happened next."  Even the prosecutor urged the court to exclude the gang evidence because it was not a gang-related shooting.  No evidence of any of Gordon's or Wilson's prior bad acts, felony records, or gang affiliation was admitted at trial.  The Attorney General would have us assume Robson abandoned his request.[4]

On this record, we will not imply either forfeiture or abandonment. The issue was raised in the motions in limine, and the court stated its disposition to deny the request.  Although we cannot discern whether a more definitive ruling was made in chambers as suggested by Robson on appeal, or whether Robson's lawyer believed the court's oral disenchantment represented a ruling, we will not attempt to evade the difficult evaluation of the merits based on the mere failure to lock in a ruling it was obvious the court had made.  Moreover, as Robson points out, the court did expressly exclude two statements indicative of its inclination to sanitize Gordon and Wilson: Robson told others that night that "these guys are killers," and prior to the shooting he warned that they were "strapped" and therefore dangerous.

Thus, the joinder put the trial court in a difficult position.  Without addressing the merits of each piece of evidence or the countervailing factors that might favor exclusion as to one, but not another, piece of evidence, we again conclude that the error, if any, was harmless beyond a reasonable doubt.  We therefore must carefully examine the evidence of duress.  There was very little.

First and foremost, defendant Robson, apparently to the court and cocounsel's surprise, chose not to testify.  Hence there was no direct evidence of his state of mind.

Second, there was no evidence that he exhibited any fear or reticence to accompany Gordon and Wilson before, during, or after the shooting.  None of the percipient witnesses testified that he looked scared, acted intimidated, hesitated, or in any manner appeared apprehensive about participating in the robbery.

---

[4]   As an aside, we point out that Robson does not argue on appeal that his case should have been severed.  Nor did he pursue a severance vigorously below as did his codefendants. Had the case been severed or separate juries convened, the trial court might have allowed the introduction of the evidence in support of the duress defense without prejudice to his codefendant.

Moreover, Robson had a preexisting relationship with his two codefendants.  He had been friends with Wilson since the third grade, and he had known Gordon for about three years.  They lived in the same apartment complex at the time of the shooting and apparently spent considerable time together socializing.  No one testified that Robson had expressed that he felt any compulsion to maintain the relationship; nor did he express or exhibit signs of stress in their presence.  Rather, he had spent the day of the shooting swimming, watching movies, and gambling with his two friends.

Nevertheless, he disavows personal responsibility for his participation in the robbery, contending he was afraid of the two of them because they were gang members with a propensity for violence.  He urges us to reverse his conviction because, he insists, the jurors might have believed he was acting under duress if they had known that he knew his codefendants were violent gang members.  We disagree.

Mere gang membership would not give rise to a duress defense.  Nor would the fact he had seen Gordon rob before or that Gordon had given him a menacing look.  Robson fails to appreciate that he is missing an essential link in establishing duress – that his will was overcome by fear and intimidation.  There is no question he chose to associate with a rough crowd, a crowd that was intimately familiar with guns and drugs.  But the evidence suggested that he was inoculated from any fear of associating with friends like Gordon and Wilson.  Simply put, we do not believe that the evidence of their gang affiliation or any of the prior bad acts he identifies would have convinced a jury that he was under duress when he entered the car and pistol-whipped Richardson.  Thus, even if the trial court erred by failing to admit the evidence, we conclude the error was harmless beyond a reasonable doubt.

*Id.* at 75-78.

As set forth above, the California Court of Appeal concluded that any evidentiary error in excluding evidence of the violent backgrounds and gang membership of petitioner's co-defendants was harmless. "When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable." *Towery v. Schriro*, 641 F.3d 300, 307 (9th Cir. 2010).  Further, a state court's decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Cooper v. Brown*, 510 F.3d 870, 921 (9th Cir. 2007) (citations omitted).  On

1   collateral review of a state court criminal judgment under 28 U.S.C. § 2254, an error is harmless

2   unless it had "a substantial and injurious effect or influence in determining the jury's verdict."

3   *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  *See also Fry v. Pliler*, 551 U.S. 112, 121-22

4   (2007) ("in § 2254 proceedings a federal court must assess the prejudicial impact of

5   constitutional error in a state-court criminal trial under the 'substantial and injurious effect'

6   standard set forth in *Brecht* 507 U.S. 619, whether or not the state appellate court recognized the

7   error and reviewed it for harmlessness.").

8          The California Court of Appeal reasoned that the exclusion of evidence regarding the

9   backgrounds of Gordon and Wilson did not prejudice petitioner's defense of duress because the

10  evidence showed that petitioner was aware of their backgrounds but still chose to spend

11  significant time with them, seemingly without fear or hesitation.  There was no evidence that

12  petitioner appeared apprehensive or frightened of his co-defendants on the night of the murder,

13  and there was little other evidence to support his defense that he acted out of fear or threats,

14  especially given his failure to testify.  This court agrees with the state appellate court that, under

15  these circumstances, the trial court's evidentiary error, if any, in excluding evidence regarding

16  the dangerousness of petitioner's co-defendants was harmless.  Evidence that petitioner's co-

17  defendants were violent members of a gang would have been largely irrelevant to petitioner's

18  defense of duress without other evidence, lacking in this case, that petitioner was intimidated or

19  frightened into participating in the robbery and murder for this reason.

20         Viewing the trial record as a whole, and for the reasons expressed by the California Court

21  of Appeal, it is reasonable to conclude that any error by the trial court in excluding evidence of

22  the gang membership and violent backgrounds of petitioner's co-defendants could not have had a

23  substantial or injurious effect on the verdict in this case.  Certainly the decision of the California

24  Court of Appeal in this regard is not "so lacking in justification that there was an error well

25  understood and comprehended in existing law beyond any possibility for fairminded

26  ////

1  disagreement." *Richter*,131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to habeas

2  relief on this claim.

### 2. Ineffective Assistance of Counsel

4      Petitioner raises several claims of ineffective assistance of counsel.  In his second ground

5  for relief, he claims that his trial counsel rendered ineffective assistance in failing to present

6  evidence that petitioner was role-playing in cooperation with the police during his custodial

7  conversations with his co-defendants, in which he made incriminating statements.  He contends

8  that this evidence was necessary for the jury to understand his demeanor and give context to his

9  inculpatory statements during those conversations.  Dckt. No. 1 at 7.  Petitioner further argues

10  that without evidence that he was acting at the behest of the police, the jury would have

11  interpreted his conduct as self-incriminating and inconsistent with his defense of duress.  *Id.* at

12  27.  Petitioner also claims that, during his closing argument, the prosecutor deliberately

13  mischaracterized petitioner's statements to his co-defendants in an attempt to discredit his

14  defense of duress, and that his trial counsel improperly failed to object to these statements by the

15  prosecutor.  *Id.* at 7.

16      In his third ground for relief, petitioner claims that his trial counsel rendered ineffective

17  assistance when he promised certain evidence in his opening statement but then failed to present

18  that evidence, and then referred again to the missing evidence during his closing argument.  *Id.*

19  The missing evidence concerned counsel's "unsupported assertion that Wilson gave [petitioner]

20  the gun with instructions to pistol whip Richardson and that [petitioner] believed he would be

21  shot once he saw Gordon pull out a gun, and he followed Gordon's orders to dispose of the

22  murder weapon."  *Id.* at 65.

23      The California Court of Appeal rejected all of these arguments, ruling, in pertinent part,

24  as follows:

25          In his opening statement, [petitioner's counsel] told the jury:
        "[Petitioner] says to them, says Hey guys, you're my friends.  The

26          two guys I came here with, are strapped.  That means they're

carrying firearms.  So watch out for yourself."  He also stated, "And about this same time, [Wilson] reaches a gun into [petitioner] and says, Get 'em.  And [petitioner's] afraid he's gonna be shot if he doesn't do something.  So he takes the .38, the pistol, the revolver, and he slaps up against the face of Alvin Richardson a couple of times real quick."  Going further, he explained: "[Petitioner] grabs that bag and he gets out.  All within a matter of seconds of being in the car, he's out of there . . . .  He hands the gun back to [Wilson], the .38 revolver, and before he'd gotten in, he had set down his bottle of brandy . . . ."

Echoing the same evidence, the lawyer argued in closing: "Mr. Wilson is carrying a .38 revolver."  Robson told McGuire and Tarbuskovich, "Watch out, watch out for yourself, these other two guys."  He went on, "[Wilson] reaches over with a .38 to [Robson] and he says, Pistol-whip him or you'll be shot."

As to Gordon, the lawyer argues, "[Robson] sees [Gordon] with his gun drawn and thinks he'll be shot if he doesn't, so he takes Wilson's . . ."  Sustaining defense objections, the court instructed the jury to disregard the statements and explained there was no evidence.  And the same objection and same admonition followed the lawyer's unsupported statements: "[Robson] responds by doing what [Gordon] says" and "[Gordon] tells [Robson] to hide the guns at his apartment."  Undeterred, the lawyer argued that Gordon asked Amber W. to get rid of the guns and Amber W., in fact, took them in her blue purse.  Yet again an objection was made and sustained that there was no evidence to support the argument.

Following the court's denial of defendants' motions for a mistrial, they insisted on a pinpoint instruction to alleviate what they believed was the prejudice they suffered from the lawyer's argument.  The court gave the following instruction: "Certain statements were made by [petitioner's lawyer] during his closing argument that were objected to by one or more of the attorneys.  I sustained those objections and admonished the jury to disregard those statements, as they were not supported by the evidence in this trial.

"Consistent with previous instructions, nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed the case but their remarks are not evidence."

* * *

Robson blames his lawyer for his conviction.  He, like his codefendants, attacks his lawyer for promising the jury he would produce evidence he failed to produce and for exacerbating the damage by reiterating the same phantom evidence during closing argument.  He insists his lawyer polluted the jurors' view of his

14

duress defense when, on several occasions, the judge had to admonish his lawyer and instruct the jury there was no evidence to support his argument.

But in Robson's view, his lawyer made an even more egregious miscalculation that deprived him of constitutionally adequate assistance of counsel.  Cooperating with the police, Robson had enticed his codefendants to make self-incriminatory statements during custodial conversations that were tape recorded.  During those conversations, Robson exhibited a sort of bravado, smirking and laughing in a manner that denigrated his duress defense.  He faults his lawyer for failing to call the police officers to correct the false impression the jury had been given that he was unafraid and undaunted by those he claimed had compelled him to participate in the robbery.  He believes it was essential the jury was informed that he was cooperating with the police during those tape-recorded conversations, and his light-hearted demeanor was but a ruse to entice Wilson and Gordon to confess.  As a corollary, he also asserts his lawyer was inadequate for failing to object to the prosecutor's argument wherein she belittled his duress defense by calling the jury's attention to how he was laughing in their presence.[5]

To establish ineffective assistance of counsel as protected by the United States Constitution's Sixth Amendment right to counsel, "defendant bears the burden of showing that (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and (2) absent counsel's error, it is reasonably probable that the verdict would have been more favorable to defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839].)" (*People v. Mays* (2009) 174 Cal.App.4th 156, 171, 95 Cal.Rptr.3d 219.)  Tactical decisions by trial counsel, even if they prove to be unsuccessful, do not constitute ineffectiveness as embodied by the Sixth Amendment.

In denying the motion for a new trial, the court explained: "We heard from Mr. Corbin," and "[h]is tactical decisions, while they

---

[5]  Robson also raises a Fifth and Fourteenth Amendment claim of prejudicial prosecutorial misconduct when, in closing argument, the prosecutor emphasized his demeanor during the custodial interrogation she knew to be a ruse.  Even if we were to accept the argument the prosecutor committed misconduct by misleading the jury and the error is of constitutional magnitude, we conclude it was harmless.  (*Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman*).)  Robson was positively identified as the Caucasian accompanying Gordon and Wilson, seen pistol-whipping the victim, and participated in dividing the loot after the felony murder.  Because there was nothing but weak inferences to support his duress defense, the prosecutor's misconduct, if any, in belittling the defense without acknowledging the ruse did not contribute to the verdict beyond a reasonable doubt.

were not successful, were reasonable."  The court added, "[A]ny omissions on the subject of duress which, as I said, was a very improbable defense to begin with, any errors that Mr. Corbin made did not fall below the standards of *Strickland*."

Robson criticizes his lawyer for promising and arguing evidence he did not produce, for failing to disabuse the jury of the wrong impression they had of his client conversing with his codefendants at a time he was acting at the behest of the police, and for failing to object to the prosecutor's argument capitalizing on the smirk he exhibited on the tape, knowing that he was a so-called agent of the police at the time.  We respond to each of the three different challenges.

As for defense counsel's derelictions during opening statement and closing argument, we conclude it is not reasonably probable Robson would have obtained a more favorable result in the absence of the inappropriate argument by counsel.  It is true a jury might be less than impressed by a lawyer who cites evidence the court repeatedly states has not been delivered.  But as the trial court pointed out here, the lawyer was actually arguing inferences in the guise of evidence, and had he but clarified that the jury could infer these facts from the evidence presented, the problem could have been averted.

We agree with Robson that the pinpoint instruction reiterating the jury's duty to ignore his lawyer's statements could not have advanced his case.  That is not to say, however, that his argument derailed his client when the evidence against Robson was overwhelming and the evidence of a duress defense anemic at best.

No one disputes that Robson pistol-whipped Richardson from the back seat of the car.  And Amber W. testified he divided up the money and drugs with Gordon and Wilson.  Since Robson did not testify, there was little evidence to support his defense of duress. Tarbuskovich testified Robson had told him to be careful of his codefendants.  Robson relies almost exclusively on the self-serving statements he made in a police interview wherein he referred to Wilson's and Gordon's propensity for violence and his own fear of them.  But he fails to demonstrate a reasonable probability that the evidence his lawyer failed to produce would have achieved a different result.  (*People v. Maury* (2003) 30 Cal.4th 342, 389, 133 Cal.Rptr.2d 561, 68 P.3d 1.)

Robson's lawyer promised evidence that Wilson and Gordon told Robson what to do and he complied out of fear.  But the jury heard evidence of what he did in Wilson's and Gordon's presence.  The addition of verbal instructions would not have added materially to what the jury had already heard.

////

Robson argues that his lawyer's failure to disclose to the jury that he was acting on behalf of the police when his conversations with his codefendants were tape-recorded torpedoed his defense. But his lawyer stated at the hearing on the new trial motion that he and Robson made the tactical decision not to call the police officers to testify his friendliness was a ruse because of their fear of the damning testimony that would be elicited in rebuttal. The lawyer explained that during a tape-recorded interview Robson told the police he was not afraid of defendants, he had no problem being in the same interrogation room with them, and he would "beat the shit" out of them. Thus, it was the lawyer's strategic decision to withhold any inquiry into his allegiance to the police to foreclose the possibility that his fearlessness, indeed his own aggressiveness, would be exposed to the jury and destroy his chance of proving duress. On appeal, Robson characterizes his lawyer's motivation as an "inchoate fear" and insists the officers' testimony would not have exposed Robson to damaging rebuttal.

We disagree. Robson's evidence of duress was thin, to say the least. If, as his lawyer predicted, the prosecution or one of his codefendants successfully introduced evidence that Robson exhibited he was not afraid of Wilson and Gordon and, in fact, was belligerent toward them, his duress defense would have imploded. We cannot write off the lawyer's tactical assessment merely as an "inchoate fear" with the assurance the evidence would be inadmissible on rebuttal. This lawyer faced a daunting task – to prove duress without putting Robson on the stand. Risking the introduction of evidence that he was ready to confront and assault the very people he claimed intimidated him was within the realm of tactical decisions to which an appellate court must defer. We cannot say the decision rendered his representation constitutionally inadequate.

In the same vein, we find the lawyer's reticence to challenge the prosecutor's argument demeaning his defense yet another ramification of the trial strategy he had adopted. Since we find the decision to leave unchallenged the impression Robson gave during the tape-recorded conversations a legitimate defense tactic, we cannot fault counsel for failing to object to the prosecutor's argument. In any event, if that argument constituted misconduct the error was harmless. (See fn. 3.)

Dckt. No. 1 at 64-65, 67-71 (opinion as modified).

To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable

17

1   professional judgment, the court must determine whether, in light of all the circumstances, the

2   identified acts or omissions were outside the wide range of professionally competent assistance.

3   *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  "Counsel's errors must be 'so serious as

4   to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-

5   88. (quoting *Strickland*, 466 U.S. at 687).  Surmounting the bar imposed by *Strickland* was

6   "never an easy task," and "establishing that a state court's application of *Strickland* was

7   unreasonable under § 2254(d) is all the more difficult." *Id.* at 788.

8        Second, a petitioner must establish that he was prejudiced by counsel's deficient

9   performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

10   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

11   been different."  *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine

12   confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just

13   conceivable." *Richter*, 131 S.Ct. at 792.

14        The California Court of Appeal's conclusion that even if the challenged actions of

15   petitioner's trial counsel constituted ineffective assistance, they were not prejudicial in light of

16   the overwhelming evidence of petitioner's guilt and the weak evidence in support of his defense

17   of duress is well supported by the record.  This court agrees that petitioner has failed to

18   demonstrate prejudice with respect to his claims of ineffective assistance of counsel.  As

19   explained by the California Court of Appeal, it was undisputed that petitioner "pistol-whipped"

20   Mr. Richardson from the back seat of the car, there was testimony that petitioner later split the

21   proceeds of the robbery with his co-defendants, and there was no significant support for his

22   defense of duress.  Under these circumstances, the failure of petitioner's trial counsel to ensure

23   the jury knew he was cooperating with the police when he made incriminating statements to his

24   co-defendants, or to substantiate his unsupported evidentiary promises with evidence, does not

25   undermine confidence in the outcome of petitioner's trial.  As noted by the California Court of

26   Appeal with regard to counsel's unfulfilled promises, "the inferences cloaked as facts were not

of the quality or quantity to compromise the integrity of the verdict."  Dckt. No. 1 at 75.  In short, under the facts of this case there is no reasonable probability the verdict would have been different absent counsel's deficient performance.

In addition, as noted by the state appellate court, petitioner's trial counsel explained that he made the tactical decision not to call police officers to testify that petitioner was cooperating with the police because he was afraid they would reveal information that could be damaging to an already weak defense.  Petitioner has failed to overcome the strong presumption that his trial counsel's decision not to call these witnesses was a reasonable tactical decision and sound trial strategy under the circumstances of this case.  Reasonable tactical decisions, including decisions with regard to the presentation of the case, are "virtually unchallengeable."  *Strickland*, 466 U.S. at 687-90.  Further, "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  *United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987).

Petitioner's claim that the prosecutor committed misconduct when she highlighted petitioner's demeanor during his conversations with his co-defendants should also be denied.  As the California Court of Appeal observed, any error in this regard was harmless.  In light of the overwhelming evidence against petitioner and the weakness of his defense, the remarks by the prosecutor, even if improper, would not have had a significant effect on the verdict in this case.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict).

Nor was petitioner's trial counsel ineffective in failing to object to the prosecutor's remarks.  "Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."  *United States v. Necoechea* (9th Cir.1993), 986 F.2d 1273, 1281 (citing *Strickland*, 466 U.S. at 689).

Because the prosecutor's closing argument did not contain "egregious misstatements," petitioner's counsel did not render ineffective assistance in failing to object to them.  Further, as noted by the state appellate court, counsel had a tactical reason for allowing the statements to go unchallenged.

For the foregoing reasons, petitioner is not entitled to relief on his claims of ineffective assistance of counsel.[6]

### 3.  Erroneous Exclusion of Evidence

In his next claim for relief, petitioner argues that the trial court violated his right to due process when it excluded certain exculpatory portions of his custodial conversations with his co-defendants.  Dckt. No. 1 at 34-36.  He argues, without elaboration, that he was prejudiced by the trial court's rulings because they "had the improper boomerang effect of improperly excluding *exculpatory* evidence as to [petitioner]."  *Id.* at 36.

As noted above in the "background" section of these findings and recommendations, the prosecution played for the jury tapes of conversations between petitioner and both of his co-

////

---

[6]  Petitioner and his mother have both filed an affidavit from the jury foreperson in this case, wherein the juror explains her thought processes during deliberations, the reason she arrived at the verdict that was reached, and her speculation as to how the receipt of certain evidence that was not introduced at petitioner's trial would have affected the jury deliberations. Dckt. Nos. 16, 17, 18.  The court may not consider this affidavit in connection with its decision on the instant habeas corpus petition.  Evidence concerning the mental processes by which a juror arrived at his/her verdict is inadmissible to test the validity of a verdict.  *Tanner v. United States*, 483 U.S. 107, 117 91987).  Rule 606(b) of the Federal Rules of Evidence provides, in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith . . . .  Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

1    defendants while they were incarcerated.  *Id.* at 49.  Prior to the admission of these tape

2    recordings:

> [t]he trial court, with the assistance of the prosecutor and defense
> counsel, engaged in a laborious process of excising the
> tape-recorded conversations of "all parts of the extrajudicial
> statements implicating any codefendants."  (*Aranda*, *supra*, 63
> Cal.2d at p. 530, 47 Cal.Rptr. 353, 407 P.2d 265; *see Bruton v.
> United States* (1968) 391 U.S. 123, 143 [20 L.Ed.2d 476] (Bruton)
> (dis. opn. of White, J.).)

7    *Id.* at 79.  Petitioner argues that "the trial court erred in failing to recognize that [petitioner's]

8    complaint was *not* that he was being unfairly *incriminated* by the portions of the tapes that were

9    played to the jury, but rather that he was deprived of the *exculpatory* parts that were *not* played

10   to the jury in deference to the non-participating codefendant."  *Id.* at 35.

11           The California Court of Appeal rejected these arguments, reasoning as follows:

> Robson . . . contends the trial court abused its discretion and
> denied him a fair trial by allowing the prosecution's redaction of
> the tape and refusing to allow him to introduce exculpatory
> statements that had been excised.  In Robson's case, he sought to
> include statements either he or Wilson made implicating Gordon as
> the person who shot Richardson, or suggesting that Gordon was
> acting on his own in shooting Richardson.  The prosecutor argued
> that the redacted transcripts "tell pretty much the whole picture of
> what happened and the roles of each one of these three
> defendants," that they were not misleading, and that they complied
> with *Aranda/Bruton*.

> Again the court gave careful consideration to the request to
> introduce more of the statements from the tapes.  The court stated
> that the tapes revealed that Robson was willing and eager to admit
> he had pistol-whipped Richardson and that all three defendants
> were attempting to get their stories straight.  But the court
> concluded the redactions were not unfair to Robson because it did
> not believe the jury would be able to discern each individual's
> involvement in the robbery/murder from the composite tapes, other
> than the fact they were all at the scene.

> We agree with the Attorney General that the statements Robson
> sought to introduce were not exculpatory and they would not have
> exonerated him.  The prosecution's theory was felony murder.  The
> felony-murder rule holds those who commit specified felonies
> strictly responsible for any killing committed by a cofelon during
> the commission or attempted commission of the felony, whether
> the killing is intentional, negligent, or accidental.  (*People v. Cavitt*

1          (2004) 33 Cal.4th 187, 197, 14 Cal.Rptr.3d 281, 91 P.3d 222
           (*Cavitt*).)  Thus the fact that Gordon was the shooter did not
2          exonerate Robson or Wilson.

3          Robson argues, however, that he wanted to introduce statements,
           not only that Gordon was the shooter, but also that Robson and
4          Wilson did not know what Gordon was trying to do when he
           hopped in the car and Wilson asked the rhetorical question, "Why
5          did he shoot that nigger?"  Robson maintains that those statements
           demonstrated Gordon was "on a frolic of his own."  He believes
6          those statements would have taken him beyond the reach of the
           felony-murder rule.  Not so.
7
           It is true that there must be a nexus between the felony and the
8          killing.  Some deaths, therefore, evade the felony murder rule
           because they are "so far outside the ambit of the plan of the felony
9          and its execution as to be unrelated to them."  (*Cavitt, supra*, 33
           Cal.4th at p. 199, 14 Cal.Rptr.3d 281, 91 P.3d 222.)  But Robson's
10         and Gordon's statements do not demonstrate the kind of attenuation
           necessary to fall outside the ambit of the rule. They merely suggest
11         that the shooting exceeded their own expectations of what would
           occur during a robbery.  The Supreme Court has made clear,
12         however, that cofelons remain liable for murder even if the killing
           is unintentional, negligent, or accidental. (*Id.* at p. 197, 14
13         Cal.Rptr.3d 281, 91 P.3d 222.)

14         As a consequence, we find the court did not abuse its discretion or
           deprive Robson of a fair trial by disallowing evidence that would
15         implicate his codefendant when that very evidence would not
           exonerate him under the wide-ranging consequences of
16         participating in a robbery that results in death.  There was no error.

17   *Id.* at 81-83.

18        The United States Supreme Court has acknowledged a "traditional reluctance to impose

19   constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*,

20   476 U.S. 683, 689 (1986).  Accordingly, a state court's evidentiary ruling, even if erroneous, is

21   grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair

22   as to violate due process.  *Estelle*, 502 U.S. at 68-70.  The United States Supreme Court has not

23   "squarely addressed" whether a state court's exercise of discretion to exclude evidence violates a

24   criminal defendant's right to present relevant evidence.  *Moses v. Payne*, 555 F.3d 742, 758-59

25   (9th Cir. 2009).  Accordingly, the decision of the California Court of Appeal that the trial court's

26   discretionary evidentiary ruling did not violate the federal constitution is not contrary to or an

22

1  unreasonable application of clearly established United States Supreme Court precedent and may

2  not be set aside.  *Id.  See Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam) (relief is

3  "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given no clear

4  answer to the question presented, let alone one in [the petitioner's] favor," because the state court

5  cannot be said to have unreasonably applied clearly established Federal law).

6        Even assuming arguendo that the trial court's exclusion of these statements was

7  constitutional error, the error could not have had a "substantial and injurious effect or influence

8  in determining the jury's verdict" under the circumstances of this case.  *Brecht*, 507 U.S. at 623.

9  As explained by the California Court of Appeal, any evidentiary error by the trial court in

10  excluding portions of the taped conversations was harmless because petitioner's statements on

11  the tape did not exonerate him.  The petitioner was guilty of the murder under a theory of felony-

12  murder even if he did not intend or know that Gordon was going to shoot Richardson.

13  Petitioner's statements to his co-defendants indicating that he did not know Gordon intended to

14  shoot Richardson, or did not intend for a shooting to occur, were legally irrelevant to the felony-

15  murder charge against him.  As the state court noted, "merely suggest[ing] that the shooting

16  exceeded [petitioner's] own expectations of what would occur during a robbery" involving the

17  use a semiautomatic handgun (of which petitioner was not only aware but actually possessed

18  while he pistol whipped the victim) hardly demonstrates an attenuation of the killing from the

19  robbery to avoid liability under the felony murder rule.

20        The state court's decision on this claim is not objectively unreasonable or contrary to the

21  facts of this case.  Accordingly, petitioner is not entitled to federal habeas relief.

22                    **4. Jury Instruction Error**

23        In his final claim, petitioner argues that the trial court violated his right to due process in

24  failing to instruct the jury that the felony murder rule would not apply to him if Gordon

25  intentionally killed the victim for reasons that were independent of and unrelated to the robbery,

26  such as gang retaliation and/or personal animosity.  Dckt. No. 1 at 8, 37.  He argues, "reversal is

required in this case because there was substantial evidence from which the jury could have concluded under proper instructions that Gordon killed Richardson because of a long-standing feud that came to a fatal conclusion on the night of August 3, 2004." *Id.* at 40-41.  Petitioner cites *Conde v. Henry*, 198 F.3d 734, 740 (9th Cir. 1999) in support of this claim.

The California Court of Appeal rejected these arguments, reasoning as follows:

**A. Felony Murder**

The trial court instructed the jury on the general principles of law regarding robbery and felony murder, including the standardized instruction CALCRIM No. 540B.  Following the basic principles enunciated by the Supreme Court in *Cavitt, supra*, 33 Cal.4th 187, 14 Cal.Rptr.3d 281, 91 P.3d 222, CALCRIM No. 540B, as given to the jury, provides in pertinent part: "A defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death....

"To prove that a defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed or aided and abetted, the robbery;

"2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, the robbery;

"3. If the defendant did not personally commit the robbery, then a perpetrator, whom the defendant was aiding and abetting, personally committed the robbery;

"AND

"4. While committing the robbery, the perpetrator did an act that caused the death of another person;

"5. There was a logical connection between the act causing the death and the robbery.  The connection between the fatal act and the robbery must involve more than just their occurrence at the same time and place.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent."

Wilson and Robson do not challenge the felony-murder instructions given, but they do challenge what might have been given and was not.  That is to say, they contend the trial court failed to give a sua sponte instruction further explaining, or pinpointing, the concept that an aider and abettor is not liable

under the felony-murder rule for a killing committed for a purpose other than in furtherance of the robbery.  They argue that Gordon's comment to Amber W. that either he or Richardson was going to be put in a coffin constituted sufficient evidence the shooting was based on a preexisting vendetta and triggered the trial court's duty to clarify and expand on the principles set forth in CALCRIM No. 540B.

We disagree.  A trial court must instruct the jury on the general principles of law that are closely and openly connected with the facts and essential for the jury's understanding of the case.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1219, 135 Cal.Rptr.2d 553, 70 P.3d 981.)  Beyond that, it is incumbent upon a defendant to request clarifying or amplifying instructions peculiar to the facts of his case.  (*People v. Garrison* (1989) 47 Cal.3d 746, 791, 254 Cal.Rptr. 257, 765 P.2d 419.)  Here the trial court properly explained the elements of felony murder, including the element that there must be a nexus, or a logical connection, between the robbery and the murder, and that the connection must be more than the coincidence of time and place.  If, as Wilson and Robson now contend, the jury should have been further instructed on the nuances of the requisite connection, they should have requested the instructions they now find essential to their defense.  The court had no sua sponte obligation to make up for their deficiency.

Dckt. No. 1 at 83-85.

In general, a challenge to jury instructions does not state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). To prevail on such a claim, petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because

1   "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

2   of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Villafuerte v. Stewart*, 111

3   F.3d 616, 624 (9th Cir. 1997) (same).

4         Petitioner has failed to demonstrate that the omission of the jury instruction he now

5   suggests should have been given rendered his trial fundamentally unfair.  As noted by the state

6   appellate court, the trial court gave a jury instruction that accurately described the elements of

7   felony murder, including the requirement that there must be a logical connection between the act

8   causing the death and the robbery.  There was evidence introduced at petitioner's trial that

9   Richardson was robbed after he was shot.  On the other hand, there was no substantial evidence

10  that Gordon killed Richardson because of a vendetta, for gang-related reasons, or for any reason

11  unconnected with the robbery.  Unlike the situation in *Conde*, the case cited by petitioner in

12  support of this claim, the trial court did not fail to instruct on an element of the defense or

13  prohibit defense counsel from arguing his theory of defense.  Under the circumstances presented

14  here, petitioner has failed to meet his "heavy" burden to show that the omission of this

15  instruction violated his right to due process.

16  **III.  Conclusion**

17        For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

18  application for a writ of habeas corpus be denied.

19        These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21  after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

24  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

25  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

26  his objections petitioner may address whether a certificate of appealability should issue in the

1  event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

2  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

3  enters a final order adverse to the applicant).

4  DATED:  May 16, 2013.

5

6                                    EDMUND F. BRENNAN
                                     UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26